CENTRAL STATES LIFE INSURANCE COMPANY *v.* ROBBINS.

4-4409

Opinion delivered November 16, 1936.

*R. E. Wiley* and *A. D. DuLaney,* for appellants.

*John L. Ingram* and *T. J. Moher,* for appellees.

BUTLER, J. This is an appeal from a decree denying foreclosure of $120,000 bond issue on the Riceland Hotel at Stuttgart. The court decreed the bonds and deed of trust invalid holding that the maker of the deed of trust securing the bond issue had no title in the property con-

veyed, but that the title was in intervener, Bank Commissioner of the state of Arkansas.

There is practically little, if any, dispute regarding material matters involved in the case at bar. The difference comes in the deductions which counsel draw from the evidence. We think the facts established by the evidence and the inferences reasonably arising therefrom may be stated as follows:

For some time prior to May 28, 1926, the affairs of the Exchange Bank & Trust Company of Stuttgart were in an unsatisfactory condition. The depositors became alarmed and on the 28th day of May a run began on the bank, which was able, however, to keep its doors open until the closing hour on that day. During the day officials of the bank applied to Mr. A. B. Banks for assistance and on the night of the 28th-29th it was agreed that if certain requirements were met, among which was the withdrawal of $120,000 "slow assets" and satisfying a lien for $80,500 on the bank building, Mr. Banks and his associates would assist in the organization of the bank to take over the assets of the Exchange Bank and assume its liabilities. In furtherance of that agreement, the six directors of the Exchange Bank & Trust Company, Mr. W. B. Wall, J. C. Robbins, R. E. John, J. F. Whaley, Theo Muense, and E. A. Draeger, took out of the bank the $120,000 "slow assets" and a deed was executed by the bank to J. C. Robbins, Trustee, conveying to him the Riceland Hotel property. Contemporaneous with the execution of this deed, J. C. Robbins executed $160,000 of notes or bonds, to secure which a deed of trust was executed conveying the Riceland Hotel property to the Bank of Fordyce, as trustee. Thereupon, the directors each executed their several promissory notes for the sum of $20,000, to which notes was attached as collateral the $160,000 of bonds executed by Robbins, Trustee. In order to relieve the bank building of the $80,500 lien a note was executed by the six directors and certain personal securities of theirs was pledged for its payment. The note was negotiated and with the proceeds the lien on the bank building was satisfied. On the morning of the 29th, a Deputy Bank Commissioner

arrived in Stuttgart. A new bank was opened, First State Bank, and the Exchange Bank, acting through the Deputy Bank Commissioner, assigned and transferred its assets to First State Bank, included in which were the six $20,000 notes of the directors and the $160,000 bonds issued by Robbins, Trustee, and attached to the notes as collateral security. The Bank Commissioner also executed a deed conveying on part of the Exchange Bank to First State Bank the bank building, expressly reserving therefrom, however, that part of the building occupied and known as the Riceland Hotel. By way of explanation, it should be stated that a single building was occupied by the hotel and by the Exchange Bank, the Exchange Bank occupying a certain part of the lower floor, the remaining part of that floor and all the structure above being used as a hotel and known as the Riceland Hotel.

At the close of the banking day of May 28, 1926, the cash of the Exchange Bank had been reduced to $758.96. First State Bank was organized at some time after the closing hours of May 28, and before 9 o'clock on the day following, at which hour the bank opened, business was resumed in the same bank building as heretofore, the only change being in the name of the bank then functioning and an increase in the number of its stockholders and directors; the six directors of Exchange Bank remaining as directors of the First State Bank, and these with the addition of Mr. E. C. Benton and Mr. A. B. Banks constituted the directors of the new bank. The six directors of the old bank took stock in the new to the amount of 430 shares of the face value of $100 each. Mr. Benton, Mr. A. B. Banks and the Home Life Insurance Company subscribed for the remaining shares of the capital stock, amounting to 1,070 shares in number. Together with the other assets of the Exchange Bank, there was transferred to First State Bank the $758.96 in cash remaining in its vaults, and to this was added other cash, or its equivalent, in the sum of $158,512.73, so that the cash and sight exchange on hand at the opening of the First State Bank amounted to the sum of $159,271.69.

On September 7, 1926, the First State Bank sold the $160,000 of bonds to Home Life and Home Accident Insurance Companies, each taking one-half of the bond issue and paying therefor $120,000 with accrued interest, being the face and the matured interest of the six $20,000 notes executed by Mr. Wall and his associates. This had the effect of discharging the notes, and they were accordingly marked "paid" and returned to the makers, the bonds being retained by the purchasers. On November 29, 1926, $40,000 of the bonds were surrendered and typewritten notes executed by Robbins, Trustee, for the aggregate sum of $120,000, which were intended to and did replace the $160,000 first issue. At the time of this transaction, the directors of the old Exchange Bank, by an indorsement on the several bonds or notes, guaranteed their payment. They also executed what was called a repurchase agreement, by which they undertook, in the event default should be made in the payment of any of the bonds, that they would themselves purchase the bonds paying therefor their face value with accrued interest. After this $70,000 of the bonds became the property of the Home Accident Company and $50,000 were the property of the Home Life. For the purpose of handling the bonds, it was deemed expedient to change their form from typewritten to lithographed bonds, and this was accordingly done. The Home Accident deposited $50,000 of the bonds with the proper authorities of the state of Arizona for authority to do business in that state. Twenty thousand dollars of the bonds were deposited in the treasury of this state for a like purpose. Under proper proceedings, these bonds finally became the property of W. C. Turner. The Home Life failed and its $50,000 bonds became the property of Central States Life Insurance Company.

The decree of the court below in suit to foreclose was based upon its theory that at the time the deed was executed by Exchange Bank & Trust Company to Robbins, trustee, and at the time the bonds were first issued by said trustee, and at the time the deed of trust was executed securing same, title had passed from the bank to the Bank Commissioner because at that time it was

concluded that the Bank Commissioner had taken over all of the assets of the bank as an insolvent bank, and, therefore, the title to the property vested in the Bank Commissioner, and the bank as such had no title to convey. The decree was further based primarily on finding that the transaction by which the hotel property was conveyed to Robbins, trustee, and the bond issue effectuated was for the individual benefit of the directors of the bank and made to discharge their debts to it, and that, therefore, the deed was without consideration, the transaction was invalid, and neither the First State Bank nor its assignees could maintain an action to foreclose.

On appeal from decrees of the chancery court we are committed to the rule that the case is tried *de novo* and while the findings of the chancellor are persuasive and will be upheld when supported by the preponderance of the evidence, or where even the evidence might appear to be evenly balanced, yet the decree would be reversed when not supported by a preponderance of the testimony. We have carefully reviewed the testimony in this case and have come to the conclusion that the finding and decree of the court below is against the weight of the evidence.

■ When we examine the testimony of J. C. Robbins, which is undisputed, together with that of the testimony of Mr. Majors, the Deputy Bank Commissioner, it is manifest that the transaction relating to the conveyance of the Riceland Hotel property to Robbins, as trustee, the execution by him of the bond issue and of the deed of trust securing same, and the organization of the First State Bank, all occurred before the Deputy Bank Commissioner arrived on the scene and before he took over the Exchange Bank as an insolvent bank (if, in fact, he ever did this). The only reasonable inference to be drawn from the testimony is that the entire transaction with reference to the Riceland Hotel property was completed some time during the night of May 28-29th. Majors testified that he arrived in the morning before the bank was due to open at 9 o'clock, and Robbins testified, in effect, that he, with other directors, was up all night May 28th-29th, and that the papers with reference to

the Riceland Hotel property were executed some time before morning. Referring to the deed of trust and bonds and the six notes, he said he executed same that night. Majors, the Deputy Bank Commissioner, merely ratified what had already been accomplished before his arrival and recognized and ratified the deed of the bank to Robbins, trustee, by expressly reserving that part of the property occupied by the hotel from his conveyance to the First State Bank.

■ We fail to find any evidence sustaining the conclusion reached by the court below, that the execution and delivery of the bonds was for payment of personal liabilities of directors, nor do we discover any ground for caustic comment made in argument imputing to these gentlemen a fraudulent intent or that they, in fact, perpetrated a fraud on Exchange Bank of which they were directors, or that Mr. Banks procured or participated in any wrongful conduct in handling the affairs of Exchange Bank or in the organization of First State Bank. The conduct of the directors throughout the whole transaction showed that they were willing to jeopardize their personal fortunes in an effort to save their failing institution. They personally guaranteed the payment of notes and accounts of the Exchange Bank in a sum in excess of $700,000, and with their individual resources raised and paid off $80,500 against the bank property. The proceeds of the bond issue on the Riceland Hotel were not used to pay any pre-existing debts of directors. The $120,000 of "slow assets" withdrawn by the directors from the bank, according to the undisputed evidence, had no value. The directors who executed the six notes derived no benefit personal to them except that shared by all interested in the Exchange Bank. The execution of the six notes for $20,000 each and the disposition of the bond issue was all made for the benefit of the bank and was a device adopted by which the value of the Riceland Hotel might be made liquid and available for the payment of debts of the Exchange Bank, and it is evident that the notes themselves were deemed unimportant, but it was merely one of the methods by which the above-mentioned purpose could be carried into effect. These

bonds were accepted by the First State Bank and sold by it for an amount equal to the face of the notes, plus the accrued interest. The result of the whole thing is that $120,000 was made available to the Exchange Bank by the issue of those bonds and this sum the First State Bank, its assignee, actually collected and used.

It was suggested in the opinion of the trial judge and in the argument of counsel that the organization of the First State Bank was void because the capital stock subscribed was not paid for in money or other things of value, but by notes merely of the stockholders. This may be true of 430 shares of stock, but there is no evidence to the effect that the 1,070 shares were not paid for in money, but, on the contrary, it may be inferred that the cash and sight exchange in the First State Bank on the morning it opened was derived from sale of the capital stock made to Mr. Benton, Mr. A. B. Banks and the Home Life Insurance Company, for, as heretofore noted, it exceeded the cash on hand at the closing of the Exchange Bank on the evening of the 28th by a sum vastly in excess of the face value of the entire capital stock. It is evident that all connected with Exchange Bank were undergoing great strain and anxiety and that they must move swiftly if they were to save the depositors and the stockholders of their bank. There might have been, and doubtless were, some irregularities committed in the closing hours of the existence of the old bank and the organization of the new, but we find none such, from which fraud might be imputed to any one in connection with the various transactions, nor sufficient to render illegal and void the transactions involved in the instant case.

The mere fact that the resolution of the board of directors of Exchange Bank authorizing the sale to Robbins, trustee, of the hotel property for $200,000 has no significance when it is remembered that the execution of all the instruments was with the full knowledge and consent of the directors and the true purpose for which the deed to Robbins was executed was accomplished.

Appellants suggest that the Bank Commissioner in the beginning recognized and ratified all transactions which he now attacks and has stood by in silence for a

period of nearly nine years, during which the rights of others have intervened, and that thereby he is estopped. It is further argued that the present owners of the bonds are innocent purchasers for value. From our observations above, it is obvious these questions pass out of the case and there remains to be considered only the question whether there should be a personal judgment against the guarantors on the $120,000 bond issue.

Mr. Wall and Mr. Robbins testified that it was agreed that they and the other directors of the old bank should be relieved of their liability by reason of the indorsement if and when they should execute an agreement to purchase the bonds at par in the event of default being made in the payment. This testimony is not disputed. They did execute the repurchase agreement at the time of the substitution of the $160,000 bond issue for the $120,000. The agreement having been proved, the effect is to relieve the directors from their liability as guarantors of the bonds. We think that appellants, under the peculiar circumstances surrounding their acquisition of the bonds, are bound by this agreement, and their cause of action against Mr. Wall and his associates, if any, is only such as the Home Life and the Home Accident Companies had on the repurchase agreement.

The views we have expressed necessarily require a reversal of the decree which is accordingly done, and the cause remanded for further proceeding in conformity with the principles of equity and not inconsistent with this opinion.